```
              IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
                    JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,       Jacksonville, Florida

              Plaintiff,        Case No. 3:20-cr-86-TJC-JBT

   vs.                          October 22, 2021

JORGE PEREZ, et al.,            9:34 a.m.

              Defendants.       Courtroom No. 10D
_____



                        STATUS CONFERENCE
           BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
                 UNITED STATES DISTRICT JUDGE
```

COURT REPORTER:

        Shannon M. Bishop, RDR, CRR, CRC
        221 North Hogan, #150
        Jacksonville, FL  32202
        Telephone:  (904)549-1307
        dsmabishop@yahoo.com


        (Proceedings recorded by mechanical stenography;
transcript produced by computer.)

<u>A P P E A R A N C E S</u>

GOVERNMENT COUNSEL:

     **ANDREW TYSEN DUVA, ESQ. (via telephone)**
     US Attorney's Office - FLM
     300 North Hogan Street, Suite 700
     Jacksonville, FL  32202

     **GARY A. WINTERS, ESQ.**
     United States Department of Justice
     1400 New York Avenue NW
     Washington, DC  20902


COUNSEL FOR DEFENDANT JORGE PEREZ:

     **THOMAS M. BELL, ESQ.**
     Thomas M. Bell, PA
     301 West Bay Street, Suite 1460
     Jacksonville, FL  32202

COUNSEL FOR DEFENDANT RICARDO PEREZ:

     **RICHARD J. LANDES, ESQ.**
     Richard Landes, Esq.
     736 2nd Street North
     Jacksonville Beach, FL  32250

COUNSEL FOR DEFENDANT AARON DURALL:

     **BRIAN T. RAFFERTY, ESQ.**
     Polsinelli, PC
     1201 West Peachtree Street NW, Suite 1100
     Atlanta, GA  30309

     **DONALD FRANKLIN SAMUEL, ESQ.**
     Garland, Samuel & Loeb, PC
     3151 Maple Drive
     Atlanta, GA  30305

COUNSEL FOR DEFENDANT JAMES F. PORTER, JR.:

     **SETH SCHWARTZ, ESQ.**
     **A.J. TASKER, ESQ.**
     Schwartz Law Group, PA
     10365 Hood Road, Suite 105
     Jacksonville, FL  32257

COUNSEL FOR DEFENDANT SEAN PORTER:

    **CALEB D. ROWLAND, ESQ.**
    Rowland Law
    2130 Riverside Avenue
    Jacksonville, FL  32204

COUNSEL FOR DEFENDANT CHRISTIAN FLETCHER:

    **STEVEN H. SADOW, ESQ.**
    Steven H. Sadow, PC
    260 Peachtree Street NW, Suite 2502
    Atlanta, GA  30303

    **VINCENT ALBERT CITRO, ESQ.**
    Law Offices of Mark L. Horwitz, PA
    17 East Pine Street
    Orlando, FL  32801

COUNSEL FOR DEFENDANT NEISHA ZAFFUTO:

    **JOSHUA SABERT LOWTHER, ESQ.**
    Lowther Walker, LLC
    Centennial Tower
    101 Marietta Street NW, Suite 3325
    Atlanta, GA  30303

COUNSEL FOR DEFENDANT AARON ALONZO:

    **DARCY D. GALNOR, ESQ.**
    Galnor Shumard, PA
    121 West Forsyth Street, Suite 610
    Jacksonville, FL  32202

COUNSEL FOR DEFENDANT NESTER ROJAS:

    **PHILIP ROBERT HOROWITZ, ESQ.**
    Law Office of Philip Robert Horowitz
    990 Biscayne Boulevard, Suite #O-903
    Miami, FL  33132

COUNSEL FOR MOVANT BLUE CROSS BLUE SHIELD OF GEORGIA, INC.:

    **LEE DILLY WEDEKIND, III, ESQ.**
    Nelson, Mullins, Riley & Scarborough, LLP
    50 North Laura Street, Suite 4100
    Jacksonville, FL  32202

COUNSEL FOR MOVANT BLUE CROSS BLUE SHIELD OF FLORIDA, INC.:

      **JARED BURNS, ESQ.**
      **ANDREW STEIF, ESQ.**
      Abel Bean Law, P.A.
      100 North Laura Street, Suite 501
      Jacksonville, FL  32202

COUNSEL FOR MOVANT UNITEDHEALTHCARE, INC.:

      **FERDOSE AL-TAIE, ESQ. (via telephone)**
      **CARMEN ORTEGA-RIVERO, ESQ. (Via telephone)**
      Akerman LLP
      2001 Ross Avenue, Suite 3600
      Dallas, TX  75201

COUNSEL FOR MOVANT AETNA, INC.:

      **E. SEAN MEDINA, ESQ. (via telephone)**
      Hahn, Loeser & Parks
      200 Public Square, Suite 2800
      Cleveland, OH  44114

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | October 22, 2021                                    9:34 a.m. |
| 3 | - - - |
| 4 | COURT SECURITY OFFICER:  All rise.  The United States |
| 5 | District Court in and for the Middle District of Florida is now |
| 6 | in session.  The Honorable Timothy J. Corrigan presiding. |
| 7 | Please be seated. |
| 8 | THE COURT:  Good morning.  This is *United States of* |
| 9 | *America versus Perez*, 3:20-cr-86.  The government -- and I |
| 10 | understand -- is represented -- Mr. Winters is here in person. |
| 11 | Mr. Duva is appearing by phone. |
| 12 | I understand -- I understand you're under the |
| 13 | weather, Mr. Duva, but you're able to appear by phone, sir? |
| 14 | MR. DUVA:  Yes, Your Honor.  I feel a little under |
| 15 | the weather.  I'm just trying to comply with the Court's |
| 16 | administrative order.  So sorry I'm not there, but can |
| 17 | participate remotely. |
| 18 | THE COURT:  All right.  And then -- I'll go ahead and |
| 19 | just -- just so we've got it for the record, I'll go ahead and |
| 20 | allow counsel for the defendants to make their appearances. |
| 21 | It's probably easier than me trying to figure out the jigsaw |
| 22 | puzzle here.  And then I'll let the insurance companies make |
| 23 | their appearances. |
| 24 | So let's start with you, Mr. Sadow, please. |
| 25 | MR. SADOW:  Good morning, Your Honor.  Steve Sadow |

1  for Mr. Fletcher.  Co-counsel Vincent Citro.

2          MR. CITRO:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          MR. SCHWARTZ:  Good morning, Your Honor.  Seth

5  Schwartz for James Porter, who is present.  Also Co-counsel

6  A.J. Tasker.

7          MR. ROWLAND:  Caleb Rowland on behalf of Sean Porter.

8          MR. HOROWITZ:  Good morning, Your Honor.  Phil

9  Horowitz on behalf of Nestor Rojas.

10          MS. GALNOR:  Darcy Galnor on behalf of Aaron Alonzo.

11          MR. LOWTHER:  Joshua Lowther for Neisha Zaffuto.

12          MR. SAMUEL:  Don Samuel for Aaron Durall, who's on

13  the phone.

14          MR. RAFFERTY:  Brian Rafferty for Aaron Durall.

15          MR. LANDES:  Richard Landes appearing on behalf of

16  Ricardo Perez, who is present on the phone.

17          MR. BELL:  And Tom Bell for Jorge Perez, who's also

18  on the phone.

19          THE COURT:  All right.  Does that -- is that all --

20  each defendant?  Is that -- does every defendant have at least

21  one lawyer?  All right.

22          Mr. Burns, will you make your appearance, please, and

23  your co-counsel.

24          MR. BURNS:  Yes.  Good morning, Your Honor.  Jared

25  Burns -- along with me is Aaron Steif -- on behalf of Florida

1    Blue.

2              THE COURT:  Mr. Wedekind.

3              MR. WEDEKIND:  Your Honor, Mr. Wedekind -- Lee

4    Wedekind on behalf of Blue Cross Blue Shield of Georgia and

5    RightCHOICE Managed Care.

6              THE COURT:  All right.  Are those all the lawyers

7    present in the courtroom?  Did I miss anybody, miss a party?

8              Okay.  And I understand that Defendant --

9    Mr. Durall -- Mr. Jorge Perez and Mr. Ricardo Perez are on the

10   phone listening in, which, of course, is fine.  And then I did

11   allow two of the insurance companies to appear by phone.

12             Is it Me-dina or Med-ina, Mr. Medina?

13             MR. MEDINA:  Good morning, Your Honor.  Yes.  This is

14   Sean Medina for non-party Aetna, Inc.

15             THE COURT:  All right.  And, Ms. Rivero.  And are

16   you -- are you lead counsel for United?

17             MS. AL-TAIE:  Your Honor, this is Ferdose al-Taie.  I

18   am lead counsel for United from Akerman LLP.  Joined with my

19   colleague Carmen Ortega-Rivero.

20             Thank you for the opportunity to appear remotely.

21             THE COURT:  And I understand you've been under the

22   weather, too.  And so we were happy to accommodate --

23   accommodate you.  I hope you're feeling better.

24             MS. AL-TAIE:  Thank you, Chief Judge.  It's been a

25   long haul.

1           THE COURT:  So we're here today for a status

2    conference that was set at -- following the last hearing in

3    this case.  And the purpose of this status hearing when I set

4    it was to come out on the other end of the discovery that --

5    and document production and issues that had arisen earlier in

6    the case, in April.

7           I set up a schedule for that to happen.  And it looks

8    like some of it has happened, but some of it hasn't.  I don't

9    think I would be -- I think I would be remiss if I didn't say I

10   was disappointed that it hasn't happened the way I envisioned

11   it and that we're still fighting about the content of a

12   protective order and -- and whether or not the production is

13   correct or not and whether there's too many redactions.

14          That's not what I had in mind.  It's not what I had

15   in mind.

16          So we're going to -- we're going to figure it out and

17   we're going to -- we're going to finish this and we're going to

18   set this case for trial.  And folks who want to go to trial

19   will have a fair trial, and folks who want to resolve it

20   another way can do that.  But we can't just keep -- we're not

21   going to just keep drifting here.

22          So I'm going to go around the horn one time and just

23   have you-all say what -- where we are and what you think --

24   where you think we are and what -- what, in your opinion, we

25   ought to be doing about it.

1          Of course, I have the appeal of Judge Toomey's

2    protective order decision.  And I'm -- I've actually written an

3    order on it, but I wanted to -- by the time I did that, we were

4    going to have the hearing.  I decided to just wait on it.

5          And I guess some of the -- some of the defendants --

6    some of the insurance companies, I guess, decided, since the

7    protective order -- since they were -- since the protective

8    order hadn't been resolved, that they weren't going to produce

9    the documents.  So we'll deal with all that and we'll get it

10   back on schedule.

11         But what I do want to be clear about was we're just

12   not -- this is not -- this will not be treated like some --

13   like a civil case, where we're just going to talk about

14   discovery and keep talking about it and talking about it and we

15   never -- we never finish it.  We're going to -- we're going to

16   finish it and figure it out.

17         And I want to be fair to the defendants, but I also

18   remind -- I will also remind the defendants that the device

19   that they're using, which is Rule 17, is not designed to be a

20   general discovery device.  It's designed to be a very specific

21   tool that we can use.

22         I want the defendants to have relevant, potentially

23   exculpatory information, if it exists, but we can't just engage

24   in a never-ending document quest.

25         I also want to remind the insurance companies that --

1   I know that you are the alleged victims in this case, but

2   you're all highly sophisticated, very large organizations that

3   are used to dealing with -- with litigation.  And we just need

4   to get this done.

5           So -- so let me start, I think, with the party

6   that -- let me start with the government, find out from

7   Mr. Winters where the government believes that it stands with

8   respect to its obligation to produce exculpatory information,

9   either *Brady*, *Giglio*, whatever the -- whatever the terminology

10  we want to use.

11          Where does the -- does the government -- where does

12  the government believe it stands vis-à-vis these insurers, and

13  I guess vis-à-vis the entire case?

14          Where does the government believe that it stands with

15  respect to its obligation to produce material that is subject

16  to production in a criminal case?

17          MR. WINTERS:  Your Honor, I don't want to belabor the

18  point -- if I can take the mask off while I speak?

19          THE COURT:  Yes.

20          MR. WINTERS:  Is that's okay?

21          THE COURT:  Yeah.  By the way, we do still have a

22  mask order in place.  And so I appreciate everybody's

23  cooperation.  But when you are speaking, you're welcome to take

24  your mask off.

25          MR. WINTERS:  Thank you, Your Honor.

1    And we laid this out in the status report, and I

2  don't want to belabor that.  But the government has turned over

3  to the defendants everything that the government has received

4  from the insurance companies in response to the subpoenas that

5  we served on the insurance companies.

6    Now, in the hearing back in April, the defense raised

7  the issue of the 837I electronic claim submissions, as well as

8  e-mails that they believed were in the insurance companies'

9  possessions that could potentially be exculpatory.

10    And the government, since then, has made

11  extraordinary efforts -- we've worked very closely with the

12  insurance companies, many, many phone calls, a lot of

13  back-and-forth, in effort to understand what they had.

14    I know the insurance companies have made significant

15  efforts.  We have gotten -- everything that we have gotten, we

16  have turned over.

17    We have gotten the 837I data from -- from all the

18  insurance companies, as much as they have.  Not all of them

19  were able to extract that information from their files.  We've

20  explained that in the status report.

21    And, again, I don't want to go over what we've

22  already said in the status report.  We've turned over

23  everything that we got from the insurance companies.  We even

24  went a step beyond that and we issued subpoenas to the

25  clearinghouses -- two of the clearinghouses, Waystar, which

1    formerly was ZirMed -- or ZirMed was -- was incorporated into

2    Waystar.

3          That was the intermediate clearinghouse that

4    initially receives the electronic claims submissions.  They

5    turn around and send those to the insurance companies; very

6    common in this industry.  That's how it works.

7          We subpoenaed them.  We received documents from them.

8    Had a further discussion, even with Mr. Sadow, who wanted to

9    see the electronic claims submissions, not just as they came in

10   to Waystar, but as they went out of Waystar to the insurance

11   companies.

12         We accommodated that.  We went back to Waystar,

13   issued another subpoena, had more conversations with them,

14   received that data.  We've turned it all over.

15         We went to another clearinghouse called Availity.

16   Some of these claims go from the provider to a clearinghouse to

17   another clearinghouse to an insurance company.

18         And in the case of claims to Florida Blue, the claims

19   went from Campbellton-Graceville Hospital, Regional General

20   Hospital of Williston, to a clearinghouse, to Availity, to

21   Florida Blue.

22         So we went to Availity to get 837I data from

23   Availity, because that's what data went to Florida Blue.  We

24   had a conversation -- we had a number of conversations with

25   counsel for Availity.  We obtained what we were able to obtain.

1    We turned it over to the defense, I think over a month ago.

2            We explained Availity's inability to -- well, they

3    had the ability to produce it all, but it was all going to look

4    the same.  It all showed the submitter as being the preceding

5    clearinghouse.

6            So I'm getting a little more into the details of this

7    837I, but it's important --

8            THE COURT:  Let me ask -- one of the things that I

9    was told at some point, either in April or the last hearing,

10   was -- I think it was in April.  And that may have kind of

11   started some of this.

12           I was told that there might be what could be at least

13   argued to be e-mails about this program or about how this

14   worked or what the insurance company's view of it was and so

15   forth.

16           First of all, has that -- have you received e-mails?

17   Are there such e-mails?  What's the -- what's your description

18   of -- of the -- of e-mail traffic that you -- that you've been

19   able to determine?

20           MR. WINTERS:  We've obtained it from the insurance

21   companies, except I think for Anthem.  And I think Anthem has

22   held off, as I understand it, on -- on their production.

23           And perhaps UHC has additional e-mails that they may

24   be holding off on producing as a result of the motion that Your

25   Honor referenced, in which they asked for an extension beyond

1    September 30th, because of the pending appeal from Judge

2    Toomey's -- Magistrate Judge Toomey's order on the protective

3    order.

4           From Aetna and from Florida Blue, I believe we've

5    received their complete productions.  Both insurance companies

6    have represented to us that everything that we subpoenaed --

7    and, by the way, we've turned over those subpoenas to the

8    defense so they can see what we've asked for.

9           Everything that Florida Blue and Aetna has produced,

10   we have turned over to the defendants.

11          I would anticipate that we're going get an e-mail

12   production from -- from Anthem.  That's Blue Cross Blue Shield

13   of Georgia and RightCHOICE Missouri.

14          I would anticipate we're going to get potentially

15   additional e-mails from UHC.  We've already gotten some.  And

16   we've turned those over to the defense, I believe.  I believe

17   we've gotten some.  Ms. Al-Taie can -- can correct me if I'm

18   wrong.

19          But, again, whatever the government has received up

20   to this point, we have turned over.

21          THE COURT:  And what's your level of confidence?

22   Because after all, this is -- I know we're in a little bit of a

23   more unusual situation because of the nature of the charges,

24   and also because of who we're dealing with and so forth.

25          But, you know, at bottom, it's the government's

1    obligation to turn over potentially exculpatory information.

2    And are you -- as you stand here right now, do you have --

3    what's your level of confidence that you have done that, and

4    that, at least as far as you know now, your job in doing that

5    is complete?

6              MR. WINTERS:  Well, it was represented at the April

7    hearing that the 837I information was exculpatory.  The

8    government has a different view of that.  What's exculpatory in

9    the eyes of a defendant is not necessarily exculpatory in the

10   eyes of the government.

11             So the government has never believed that the 837I

12   claims submissions are exculpatory.  Nonetheless, at Your

13   Honor's urging, and in order to ensure that there's a full

14   record and the defendants have access to all the materials that

15   they think might be exculpatory, we've gone through this

16   exercise of obtaining these electronic claims submissions, not

17   just from the insurance companies, but also from the

18   intermediate clearinghouses.

19             So we have a very high degree of confidence that

20   we've obtained the exculpatory material, such as it is.  To the

21   extent that the defendants believe it's exculpatory, the

22   government is not here to represent that any of it is

23   exculpatory at all.

24             But we have gotten what Your Honor has urged us to

25   get, what the defense has said that they want to get.  We've

1  made every effort to accommodate those defense requests.  And

2  we've turned all those materials over.

3          I think what's happened here, and I think what you're

4  going to hear from the defense, is they're not happy with --

5  with the material they've gotten.  It's not exculpatory.

6          I think they recognize, perhaps, that it's not

7  exculpatory, and so they want more.  And they're going to be

8  unhappy with the Waystar production.  I'm sure you're going to

9  hear that from the defense here, that they believed it's been

10  altered or scrubbed in some way.  I think that -- there was a

11  reference to that in one of their papers.

12          But, again, from the government's perspective, we

13  believe we've -- we've obtained everything we could possibly

14  obtain that the defense believes is potentially exculpatory,

15  and we've turned it over.

16          THE COURT:  So, in your view -- what is your view of

17  the continued efforts by the defendants, which I'm going to

18  start talking to Mr. Sadow about in a moment, to receive

19  additional materials?

20          Does the government have a position on -- on those

21  efforts?

22          MR. WINTERS:  Well, I'm not sure what additional

23  materials beyond the unredacted materials that they want from

24  the defense they are seeking.  Well, actually, let me take that

25  back.

1          There are outstanding Rule 17 subpoenas.  I

2    apologize.  There are several outstanding Rule 17(c) subpoenas.

3    Our view about that is that, you know, if the defense wants to

4    seek that material, they're entitled to seek it.  They've moved

5    for the Rule 17 subpoenas.  The subpoenas have been issued.

6          We don't believe that there's going to be any more

7    exculpatory material out there.  If they want to keep digging

8    into the insurance companies' files in the hopes of finding

9    something exculpatory, that's up to them.  And that dispute can

10   be had between them and the insurance companies.  And Your

11   Honor will resolve any disputes.

12         But from the government's perspective, we're -- we

13   have -- when we investigated this case, we obtained material

14   that we believed was going to prove the government's claims.

15         To the extent that there was anything exculpatory

16   that we obtained in the course of our investigation, whether

17   turned over by -- in response to grand jury subpoenas or

18   obtained by agents or obtained in any other fashion, we have

19   turned that over.

20         The government has had essentially open-file

21   discovery in this case.  We've turned it all over.  So those

22   disputes are really, in my view, not for the government to --

23   to weigh in on.

24         I have no idea what else might be in these gigantic

25   insurance companies' files.  And I'm not sure that the

1  defendants do either.

2       But they have some notion that if they keep filing

3  additional Rule 17 subpoenas, they're going get some

4  exculpatory material.

5       In the government's view -- I think we agree with

6  Your Honor that it's time to end this -- this endless chasing

7  of additional discovery and this sort of mirage of exculpatory

8  evidence that the defendants think they're going to get from

9  the insurance companies, and set this case for trial.

10      THE COURT:  Thank you.

11      MR. WINTERS:  Thank you.

12      THE COURT:  Mr. Sadow, are you -- you were lead last

13 time in discussing these issues.

14      Is that still the case, sir?

15      MR. SADOW:  Good morning, Your Honor.  The answer to

16 that is not entirely.

17      THE COURT:  Okay.

18      MR. SADOW:  Discovery-wise, I believe that there are

19 other counsel that are prepared to make statements to the Court

20 about what has and has not been produced.

21      What I want to address is related to that, but it may

22 be such that my presentation is best done after you've

23 addressed some of the discovery issues.

24      THE COURT:  That's fine.  So who -- who should I call

25 on, Mr. Sadow, to deal with that?

1      MR. SADOW:  Mr. Rafferty, on behalf of Mr. Durall.

2      THE COURT:  Sure.

3      MR. RAFFERTY:  Good morning, Your Honor.

4      THE COURT:  Good morning.

5      MR. RAFFERTY:  As Mr. Sadow said, I think some of the

6  other defendants have specific issues they want to address.

7  But I think it's probably appropriate for me to respond to some

8  of the things that the government has said.  I've spoken with

9  Mr. Winters.

10      I don't think that any of the defendants disagree

11  that the government has tried to get a lot of information and

12  that they have produced a lot of information since the last

13  hearing in July.

14      By my count, I think we've gotten about 12

15  productions of different kinds of information, EDI information,

16  e-mails, manuals, things of that nature, all of which we are

17  greatly appreciative of.

18      But we disagree with the government about what has

19  been produced and what has not been produced, and the fact that

20  we do not believe that this case is ready to be set for trial

21  because some of the significant gaps in what's been produced

22  need to be resolved.

23      So just going back to April, Your Honor, when this

24  issue arose with the EDI data, it arose because, in the

25  discovery that the government initially produced, they gave us

1    these Excel spreadsheets, which purported to be the billing

2    data that the defendant submitted that is purportedly false.

3         In advance of that April hearing, I think we learned

4    through the *Putnam* case up in Missouri that, in fact, there may

5    have been additional fields of data that was submitted by the

6    defendants that was not in the data that the government

7    provided to us, which is what led us to have that hearing in

8    April, and which is what led the government to submit all these

9    additional subpoenas to collect that information.

10        What we have learned since April in some of the later

11   submissions is that, in addition to the fact that -- there is

12   fields of data that appear to not be provided to the government

13   by these insurance companies, but also that there are fields of

14   data that have been added in some form, that were not submitted

15   by the defendants, but which appear in the claims data that the

16   government submitted to us.

17        And so the underlying data itself is critical to our

18   defense, because we're all accused of submitting false claims,

19   that what we submitted is false.  The government gave us what

20   they thought was what we submitted.  But what we have learned

21   is that what we submitted and what the -- what the government

22   has are not the same.  And I think that's the heart of our

23   concern.  And these other clearinghouses are critical to our

24   defense.

25        So the process here -- just to be clear, it starts

1    with a billing company.  I believe the government identifies it

2    as JVS.  That billing information is submitted and goes through

3    a series of clearinghouses, whether it be Office Ally, ZirMed,

4    Availity, before it ends with the insurers.

5             In order for us to understand what it is that we

6    submitted, we need the data that -- how it transfers through

7    these different places before it ends with the insurers.

8             Because what the government has they say we

9    submitted, but it's clear that's not what we submitted.  What

10   we submitted started in a different place.

11            So, you know, the government issued, for example,

12   subpoenas to Availity.  They've talked about Availity.  But

13   what we've gotten from Availity is 15 sample claims on an Excel

14   spreadsheet that strictly focused on the submitter information.

15            But the submitter information is just the beginning

16   of the story from Availity.  We need exactly what was

17   submitted.  All of the different codes that were submitted

18   through Availity.  And Availity really hasn't produced anything

19   but an Excel spreadsheet.

20            The Excel spreadsheet that we got from them isn't the

21   actual EDI data.  It's just a summary that focuses on the

22   submitter information.  It's incomplete.  And it's only 15

23   claims.

24            What the defendants need is exactly what Availity

25   received, the raw data, so that we can see what it is that was

1    received by Availity, and then what was sent by Availity to the

2    insurance companies.

3          I think Mr. Winters has talked about some of the

4    other gaps.  We haven't received any EDI data or e-mails from

5    Blue Cross Blue Shield to Georgia.  We haven't received any

6    e-mails or EDI data from RightCHOICE.

7          As I said, we haven't received really anything from

8    Availity but an Excel spreadsheet.

9          Office Ally, which is another one of these

10   clearinghouses through which all of this information flowed,

11   hasn't produced any information in response to a 17(c) subpoena

12   issued by Mr. Schwartz.

13         We have -- you know, significant e-mails have been

14   produced, Your Honor.  But a lot of these e-mails have been

15   redacted.

16         In particular, just looking at UnitedHealthcare, a

17   significant percentage of what's been produced has been

18   redacted.  Some of the privilege logs that accompany those

19   redactions are helpful.  And they certainly provide a lot of

20   information about what the claim of privilege is.  But others

21   are not.

22         You know, UnitedHealthcare really hasn't provided any

23   EDI data.  I believe in one of the earlier reports they said

24   they don't have it.  Florida Blue, I believe, has indicated

25   that it doesn't have it.

1            And the problem that we see with that, Your Honor,

2    which is why we don't believe this case is really ready to be

3    set for trial, is because, if the government intends on relying

4    on this Excel spreadsheet as evidence at trial, under

5    Rule 1006, we're entitled to the underlying data that falls

6    into that Excel spreadsheet.

7            And all of this EDI data we've been talking about is

8    that, and it has not been available and made available to any

9    of the defendants.

10           And so that is the reason why we have grave concerns.

11   And we disagree with the government in its contention that

12   there is no exculpatory information in there.  We believe there

13   is.

14           And some of the questions -- and I think I can turn

15   to Mr. Sadow now to talk about the specific questions that he's

16   raised as it relates to Waystar, because there's information in

17   the data that Waystar has provided that they refuse to provide

18   an explanation for, but which raises real questions about the

19   validity of the EDI information that they provided.

20           So, Your Honor, we think there's a lot of gaps in

21   what has been produced.  We think that, you know, the

22   government has tried its best, but these insurance companies

23   have not provided a significant amount of the information that

24   we've asked for, which would be exculpatory in nature.

25           And I'll turn it over to Mr. Sadow, unless the Court

1    has questions.

2          THE COURT:  Before you do that, so what's the current

3    state of affairs?  How many Rule 17 subpoenas are out there?

4    How many are -- how many have been completed?  What -- where do

5    we stand with that?

6          MR. RAFFERTY:  Your Honor, my understanding is -- the

7    government has sent us Rule 17(c) subpoenas issued to Blue

8    Cross Blue Shield and RightCHOICE.  We've gotten manuals in

9    response to that.

10         THE COURT:  No.  I'm not necessarily talking about

11   what the government did.  The government made an effort.  And

12   Mr. Winters says that he -- if I understand it correctly, he

13   said he's satisfied with the effort the government made, and

14   that -- and that -- if I understood him, they're not trying to

15   get more information.

16         There may be information that hasn't been produced

17   because y'all are fighting about this protective order, so then

18   the insurance company said that they wouldn't produce the stuff

19   until I -- until it got straightened out.

20         But -- but what I'm asking you is, I -- I understood

21   the defendants to have made their own separate Rule 17

22   requests.

23         Isn't that true?

24         MR. RAFFERTY:  That is correct, Your Honor.

25         THE COURT:  And I'm asking you how many of those are

1    out there?  And what's the state of affairs with respect to

2    returns on those?

3              MR. RAFFERTY:  With respect to the 17(c) subpoenas

4    that were issued by Mr. Durall, Mr. Samuel can -- can address

5    that.  I believe Mr. Schwartz has some outstanding 17(c)

6    subpoenas as well.

7              THE COURT:  All right.

8              MR. SAMUEL:  Your Honor, with regard to Mr. Durall's

9    17(c) subpoenas, document 413, we submitted -- sorry.

10             Document 413 shows that we have reached agreement

11   with virtually all the insurance companies.  We modified our

12   request.  Because some of our requests were too broad, I said

13   that I would just modify them.  And we just agreed we'll just

14   issue new ones.  And I think those will be resolved simply.

15             We seem to have an agreement that if I can narrow the

16   request with regard to -- I can't remember what paragraph it

17   was, all of which is document 413, our report to the Court --

18   so there's nothing pending on our current 17(c) subpoenas,

19   which doesn't mean we won't have more.  I think we do

20   envision --

21             THE COURT:  That's the thing I want to find out

22   about.  I mean, how many of these -- how many of these are we

23   going to do?

24             I mean, you know, the government -- I asked the

25   government to do what it could do and what it should do to try

1    to work with the insurance companies to produce information

2    that -- and I understand there's a debate about whether it's

3    exculpatory, but potentially exculpatory.

4            In April we identified some concerns y'all had.  And

5    that was -- and I thought those concerns were legitimate enough

6    to authorize all this.  And so now the government says it's

7    basically done what it thinks it's supposed to have done.

8            Y'all have issued, on your own -- which I also

9    didn't -- I authorized, I guess.  And Judge Toomey has been

10   granting these unopposed Rule 17 requests, which, as you know,

11   is not necessarily a slam dunk.

12           I mean, Rule 17 is a limited tool.  It's not supposed

13   to be a general discovery tool.  But they've been unopposed.

14   Judge Toomey's issued them.  And you-all -- so y'all have done

15   that.  And if Mr. Schwartz has done some of that, okay, that's

16   all good.

17           And you're going to get -- you either have already

18   gotten or are going to get documents in response to those.  If

19   you're unhappy with that response, then you would have a -- I'm

20   not encouraging this, but you'd have a vehicle to come to the

21   Court and ask to move to compel further compliance, or

22   whatever -- whatever the vehicle is, unless you can work it out

23   with them.

24           MR. SAMUEL:  We have worked it out.

25           THE COURT:  Okay.  Well, that's fine.  What I'm

1    saying to you is:  Why then am I hearing about a new set of

2    Rule 17 subpoenas?  What -- what didn't you ask them the first

3    time that you want to ask them now?  That's what I don't -- and

4    when is that going to end?  That's what I want to know.

5            MR. SAMUEL:  I -- let me begin by saying we have

6    worked very well with the insurance companies.  They've

7    provided us everything we have asked for.  And when they

8    couldn't and they said to me -- we had many conference calls.

9    We worked everything out.

10           THE COURT:  Okay.

11           MR. SAMUEL:  I'm a little unsure why you're

12   discontent with our doing exactly what you told us to do, which

13   was work it out.  We worked it out.  We have one request --

14           THE COURT:  Well, then why am I hearing that we can't

15   go to trial, we're still going to have to do things?

16           MR. SAMUEL:  There are lots of issues out there, Your

17   Honor.  The 17(c) subpoenas that we've issued is not one of the

18   problems.  There are many problems, you know -- I don't want to

19   add everything that Mr. Rafferty just talked about.

20           But, you know, in our bill of particulars we asked

21   for very specific answers to questions.  We still don't have

22   answers to those.  And I know that you have ruled and said,

23   Well, just look at the discovery.  And it's not in the

24   discovery.

25           And that's -- that is -- if you really want to know

1   the root of the problem, in my opinion, is that when we've

2   asked, "What do you claim we said that was wrong?  What are you

3   claiming" -- the government -- "that you claim that we filed a

4   false document" -- and they won't give us the documents that we

5   filed.

6              It's -- that's the problem.  It's not the 17(c)

7   subpoenas.  The 17(c) subpoenas, Mr. Wedekind and I have had --

8   I don't know how many phone calls.  And they've worked out

9   perfectly.

10             There was one request we made that wasn't worded

11  right.  My fault.  He said, "If you'll modify it, I" --

12             THE COURT:  Okay.

13             MR. SAMUEL:  So it's not a problem.

14             THE COURT:  All right.  If it's not a problem, it's

15  not a problem.

16             All right.  So -- so what are the problems?  What --

17             MR. SAMUEL:  Mr. Rafferty --

18             THE COURT:  Wait a second.  If you're telling me that

19  the government's produced a bunch of stuff, the insurance

20  companies are working with you to produce a bunch of stuff, I'm

21  going to rule on this protective order, and that will unleash

22  the documents that haven't been produced yet -- all right.  All

23  that is going to happen, let's say.

24             And you say we're not having any problem with that

25  and so forth.

1           Okay.  So that's all happened, or will happen.

2           So Rule 17s have been returned.  There we go.

3           All right.  So now you've got this set of

4    information.  So what -- what are the -- what are the issues?

5           MR. SAMUEL:  Can I defer back to my co-counsel?  I'm

6    here just speaking to the set of 17(c) subpoenas that Durall

7    filed a couple of months ago.

8           That has nothing to do with the -- the absence of the

9    documents we have requested from the government or the

10   insurance companies, you know, dealing with the EDI

11   information, dealing with the forms that are filed.

12          It's a separate issue.  We didn't even ask for that

13   in our 17(c) subpoenas, because we believed that the government

14   was getting all that pursuant to their subpoena.

15          And I think Seth has done additional 17(c)s -- I'm

16   sorry.

17          Mr. Schwartz has done additional 17(c)s.  Mr. Sadow

18   has done -- I'm just here to address, in essence, the --

19   document 413.

20          THE COURT:  So you're a happy guy?  You don't have

21   any problems?

22          MR. SAMUEL:  I'm as happy as can be, Your Honor.

23          THE COURT:  All right.  Very good.  So I guess

24   somebody --

25          MR. SAMUEL:  With my limited issue, we have --

1   Mr. Wedekind and I have just gotten along just famously.

2           THE COURT:  All right.

3           MR. SAMUEL:  That doesn't mean the case is ready.  I

4   don't want you to misinterpret my happiness for the happiness

5   of the entire group.

6           THE COURT:  All right.  So let me talk to somebody

7   who's not happy.

8           MR. SCHWARTZ:  Judge, Seth Schwartz on behalf of

9   James Porter.  As to our 17(c)s, there's been two that have

10  been issued; one to Office Ally that I was in communication

11  with them pretty regularly.

12          They're getting it together.  We talked about a

13  rolling production.  That was actually issued and served

14  July 28.  I have gotten nothing.  I'm getting no response from

15  them.  I'm going to have to file a motion to compel their

16  compliance.

17          There were no objections or anything else.

18          THE COURT:  Who -- I don't -- who are they?

19          MR. SCHWARTZ:  Office Ally is one of these

20  clearinghouses, essentially, that when the original billing

21  data goes, it goes to one of these clearinghouses that adjusts

22  it and does something and sends it to the insurance companies.

23          THE COURT:  Are they controlled by one of these

24  insurance companies?  Or are they their own entity?  Or what?

25          MR. SCHWARTZ:  Office Ally I believe is owned

1  independently.  Availity is owned by Florida Blue and Humana

2  together, but I'm not sure exactly if Office Ally is tied --

3  but they basically said that they're working on it, "We're

4  going to produce it."

5          That was the last communication I had with them, was

6  over a month ago.  So it's time to -- to compel it.  And I'll

7  explain --

8          THE COURT:  Do they have a lawyer?  Do they have

9  their own lawyer?

10          MR. SCHWARTZ:  I'm sorry?

11          THE COURT:  Do they have a lawyer?

12          MR. SCHWARTZ:  I spoke with general counsel.  And

13  they said that they were working on it.  The general counsel

14  didn't really know much about the tech side.  The tech side

15  said, "We're trying to get this together."

16          And it's been crickets ever since.

17          So -- and Mr. Rafferty talked about the importance of

18  that; essentially that that's some of the native data that the

19  government is relying upon to potentially admit these Excel

20  spreadsheets as the billing information, which the native data,

21  quite frankly, that I've been asking for since May of 2019,

22  when this case was proffered to me, still has not been

23  produced.

24          The government said that they produced that 837I

25  data.  I don't have that.  It's not in the discovery.  And

1    they're relying on the spreadsheets that -- the spreadsheets

2    have added a tremendous amount of information that is not

3    contained in the original data.  So that becomes a Rule 1006

4    issue that I think Mr. Sadow or somebody will talk about.

5           The other outstanding 17(c) that I have is to

6    RightCHOICE.  And it's a very limited 17(c).  I have a number

7    of e-mails in my possession that are Bates stamped from civil

8    litigation in Missouri.

9           The motion that I filed and the subpoena that I

10   issued specifically identified those e-mails by Bates stamps.

11   I offered to send them the e-mails.  All they had to do was do

12   a BRC and return them.  And I haven't had any of that back.

13          There was a motion filed basically saying that they

14   are, you know, waiting, I guess, on the -- the Court's ruling

15   as to the exceptions that were written on Judge Toomey's

16   protective order.

17          But my request is limited to maybe 60 or 70 specific

18   e-mails.  And, again, I -- I offered to send them the documents

19   that they previously produced in the other litigation.  All

20   they've got to do is take a look at them, verify them, turn

21   them around to BRC.  It takes a couple of hours max.  And I

22   have not received that.  That was done at the end of September.

23   And I've had no communication back from them on that.

24          And then we just issued a -- or in the process of

25   issuing a subpoena to Putnam County Memorial Hospital.  The

1    order was just issued last week.  The subpoenas are --

2    hopefully will be issued today by the clerk.  And then we'll

3    have them served.

4         That deals with the methodology of billing.  One of

5    the claims that the government has made is the way that the

6    bills were -- were submitted under the UB-04, is for reference

7    laboratory work, is a basis of the fraud.

8         Putnam County is using Quest as the reference

9    laboratory.  Putnam County is still billing the same way that

10   they -- our clients were alleged to have billed.

11        They're still receiving money from Blue Cross.

12   They're still keeping some of the money from Blue Cross and

13   then paying the end network laboratory Quest.

14        So we think that that's extremely important, to show

15   that the billing methodology that they're claiming is

16   fraudulent is actually something that's still being used by an

17   insurance company that was a witness for Blue Cross in the

18   civil litigation that -- that trial just happened a couple of

19   weeks ago.  Blue Cross is well aware of that.  And it's kind of

20   the industry standard.

21        So that one I expect to get a response on hopefully

22   pretty quickly.  We intend to have that served probably next

23   week.  And I don't expect to have any major issues with that.

24        But as to the other ones, I've received nothing.

25        I've got some information -- I don't know if you want

1   to have me skip it -- dealing with the privilege logs and

2   dealing with the e-mail production from Florida Blue and from

3   UnitedHealth.

4        I can show the privilege logs to you.  I've got

5   copies for everybody, or if you want me to step back and you

6   can finish your thought process.  However you want to do it.

7        THE COURT:  Well, I don't know -- I'm not sure how

8   quite into the weeds we're going to be able to get this morning

9   on -- on that.  I take it you're -- you feel like they're

10  deficient in some way?

11       MR. SCHWARTZ:  Yes, sir.  It will literally take five

12  minutes.  I can show you what they look like.  I've got copies.

13       THE COURT:  Have you talked to them about it?

14       MR. SCHWARTZ:  We've talked to United about it.  And

15  so United made a production -- they've made a privilege log

16  production that we believe is absolutely patently insufficient.

17       It doesn't describe the summary of the documents.  It

18  just lists the -- the same basis of privilege over and over and

19  over, copies and pastes it.

20       And I know you don't have a specific order on what

21  privilege logs are, but there are other judges in the Middle

22  District that do.  And there's a lot of case law that talks

23  about this.

24       In addition to that, apparently there are items in

25  the e-mails that are redacted that are not part of the

1   privilege log.

2           So there are what counsel for United called families

3   of e-mails that are privileged that identify themselves in the

4   privilege logs.  But then there's other information in these

5   e-mails that are redacted that are not part of the privilege

6   logs.  And we literally can't determine anything from it.

7           The stuff that's redacted apparently is PHI that is

8   protected by the protective order, and some financial

9   information that would also be protected by the protective

10  order.  And it just -- it doesn't tell us anything.  It

11  doesn't help us with anything.  And that's both United and

12  Florida Blue.

13          Florida Blue has gone through and literally just

14  blacked out page after page, and provided some information.

15  And then other information is just -- it's absolutely useless

16  to us.

17          We have had conversations with Aetna.  It took a

18  number of hours, with Mr. Bell and I and Aetna's counsel.  We

19  were able to resolve a lot of those issues.  They were very

20  helpful to us.

21          And those just dealt with the designations, whether

22  it was confidential or super confidential -- whatever the

23  designations were in the protective order.  They did not seek

24  to redact whole portions of e-mails and other things.

25          Originally they were concerned about some names.

1    Mr. Bell and I and Aetna's counsel agreed that as to certain

2    things that they may consider sensitive, that -- you know, go

3    ahead and redact those, but then remove the designation

4    pursuant to the protective order.

5            It took us, seriously, like three or four hours to go

6    through 175 pages of documents, not 175 e-mails.  There are a

7    ton of e-mails that essentially produce nothing to us.  And so

8    we have a major issue with that.

9            The protective orders [sic], again, are legally

10   insufficient, and not even close to being sufficient.  I can

11   file a motion on that and the Court can hear that, but I just

12   wanted to bring it to your attention today because we're

13   talking about these discovery issues.  And --

14           THE COURT:  When you say the protective orders are

15   illegally insufficient, do you mean the privilege logs?

16           MR. SCHWARTZ:  I'm sorry.  Yes, the privilege logs,

17   not the protective -- the privilege logs are absolutely legally

18   insufficient, according to law in the Eleventh Circuit, the

19   district courts, and then some of the local -- local rules.

20           It essentially doesn't give us any -- aside from

21   Aetna -- and I'll give Aetna credit for that.  But as to at

22   least Florida Blue and UHC, we don't know what the -- the items

23   are, what the documents are.  We know who they were sent to.

24   We know who received them.  We know what their claimed

25   privilege is.

1       But we don't know -- you know, we have some of them

2   that say a subject line, but it doesn't talk about a synopsis

3   of what it is so that we can look at it and determine whether

4   it's something that should be challenged or not.

5       And these privilege logs are big.  They're not --

6   they're not small documents.  I think there's 27 pages, and

7   small type like this, for UnitedHealth.  And I think there's 19

8   or 20 pages with -- with Florida Blue.

9       But until we're able to look at these privilege logs

10  and understand what the basis of the -- not just the claim

11  privileges, which we have, but the summary of whatever these

12  e-mails are -- we're not going to be able to do anything with

13  them.

14      And the last thing we want to do is ask the Court to

15  review God knows how many pages in camera just because these

16  privilege logs are deficient.

17      We have not received any privilege logs from

18  RightCHOICE because they have not produced their e-mails yet.

19  But I anticipate getting a large privilege log from them also.

20      I'm hoping it's going to be more like Aetna's, that

21  will actually give us information that we need to be able to

22  look at and make a determination whether we need to challenge

23  any of those specific e-mails or not, and not like Florida Blue

24  or UnitedHealth, as to those issues.

25      THE COURT:  Thank you.

1          MS. AL-TAIE:  Your Honor, this is Ferdose al-Taie for

2    United.  May I respond to some of the statements that have been

3    made about my client?

4          THE COURT:  Yes, ma'am.

5          MS. AL-TAIE:  All right.  So I would like to start

6    first with the government's statement regarding our production.

7    As you have heard from the government and defendants, we have

8    produced documents even though the protective order has been in

9    play.

10          We believe that Your Honor will uphold the protective

11    order as it is.  I personally am a former criminal prosecutor.

12    I was an AUSA.  My client and I strongly believe in the

13    constitutional requirement to provide defendants with the

14    information they are seeking in order to lodge their defense.

15          However, we also very strongly agree with the

16    government that there is no exculpatory information in the

17    additional documents that defense has sought.

18          We believe it's their right to determine that.  That

19    is why we did our production.  That is why we did a fulsome

20    production and a fulsome privilege log.

21          And in going through our documents, we produced

22    e-mails, there have been statements made today -- and I'm glad

23    that someone in the courtroom has copies of our privilege

24    log -- that what we have produced is a cut-and-paste without

25    detailed explanations.  That is not correct.

1          Our explanations state whether it was an e-mail with

2    attachments, a presentation, distributed among company

3    employees -- a document distributed among company employees.

4    It states why it was withheld.  And there are these details.

5          The reason why we did that was we wanted defendants

6    to see that not only were we being forthright and forthcoming,

7    but that we were specifically holding back things that related

8    to our investigations, not anything involving their client.

9          We received one e-mail questioning our privilege log

10   from defense counsel.  We responded to that e-mail, and -- on

11   October 13th, giving detailed information to explain how we

12   classify different documents.

13         One thing I want to make clear to the Court is that

14   internally we have, like many insurers have, a team that

15   investigates fraud.  That is their primary responsibility.

16         Our documents are not specific to these defendants.

17   We have massive teams with massive spreadsheets, and long

18   e-mail chains, where we are conducting investigations using

19   coded language -- you know, each investigation has a different

20   code name, as if it were an antitrust matter.

21         And we have produced only what is relevant to these

22   defendants.  We have not produced anything regarding our other

23   ongoing investigations that have nothing to do with this.

24   That's what has been described to defendants.

25         So when we are producing -- and there are, indeed,

1    pages of redactions.  We have done our privilege log so that

2    they could tell whether it was competitively sensitive

3    information that, in fact, is information not having to do with

4    this case.

5            We do not believe that the Court would want us to

6    produce any information regarding other investigations.  And

7    we, of course, would assert, and have asserted, a very serious

8    attorney work product and privilege regarding those.

9            Now, if defendants are saying that they do not

10   believe our designations -- you know, I have personally done

11   these.  We have reviewed documents very carefully.  We have

12   produced full families of documents.

13           And by that I mean where there was an investigation

14   and spreadsheets were e-mailed around involving numerous

15   investigations.  We actually produced entire families so that

16   the defense could see how big the original e-mail or document

17   was.  And we redacted things that were not part of their case.

18           We believe that's appropriate and we would welcome an

19   in-camera review of all our privilege calls.  We're very

20   confident in our production and we are very confident that not

21   only have we complied with the court order, but we have gone

22   above and beyond to provide the defendants with as much

23   information as they want.

24           I do believe that they are frustrated because they

25   think that there is information contained in this type of data

1   and these types of e-mails that is exculpatory.

2              We have not seen evidence of that.  And they are not

3   seeing evidence of that in our production.

4              Your Honor, do you have any questions for

5   UnitedHealthcare?

6              THE COURT:  Not at the moment.  Thank you.

7              MS. AL-TAIE:  Thank you, Your Honor.

8              THE COURT:  And I'll talk to the other insurance

9   companies momentarily.  But I did want to -- all right.  Is

10  there any other defense counsel that wanted to address

11  discovery issues?

12             MR. SADOW:  Only in connection with the presentation

13  I'm going to make, but not in the lack of production, per se.

14             Would you like to hear from -- what I'm referring to

15  before we move on?

16             THE COURT:  Yeah.  Let's go ahead.  Yeah.

17             MR. SADOW:  When we were before the Court the last

18  time, I believe the defendants' joint position was that claims

19  submissions done through EDI, electronic data interchange,

20  837Is from the defendants were accurate.

21             And we didn't have the information to be able to show

22  the process in which our accurate submissions, which we believe

23  to be exculpatory -- obviously the government does not agree

24  with -- how those evolved into what the insurance company

25  received.

1          So now what we have is Empower, which is the billing
2    company that submitted these electronic claims, submitted them
3    to clearinghouses -- the clearinghouses are Office Ally and
4    Waystar, which then was ZirMed.
5          The government has provided us information from
6    Waystar.  You've already heard about -- that we're still
7    waiting for information from Office Ally.
8          Waystar, ZirMed, sends its information, its EDI,
9    electronic data, claims through -- directly to an insurance
10   company or to another clearinghouse called Availity.
11         What we've been able to determine is what we
12   submit -- that is, what the defendants submit from Empower --
13   changes when it gets to Waystar, to ZirMed.
14         And Waystar sends out altered or scrubbed information
15   to either Availity, who may then scrub it again, or directly to
16   the insurance companies, which do their own form of scrubbing.
17         So what we've got now is a situation where we send A,
18   A becomes A plus or B; B becomes B plus or C; and by the time
19   it gets to the insurance company, it's something -- it's D.
20         What we've also discovered is the insurance company
21   populates its information with information that has never come
22   from the defendants.
23         The problem is we don't know how this takes place; we
24   don't know why this takes place, which was why I thought it was
25   so important last time that we get the 837 information,

1    which -- I'm in agreement with the government -- they've turned

2    over to us, apparently, everything that they've received.  So

3    my fault is not with the government.

4         My request at this point, though, is we need a

5    hearing -- what I would call a 104(a) hearing -- so that the

6    Court can determine the authenticity of what has been turned

7    over, not in the sense of whether it has been altered for fraud

8    purposes, but how this evolution of data changes so you can

9    determine authenticity and admissibility.

10        And what we were talking about with Waystar, and what

11   I had attempted to communicate with Waystar, was -- I've gone

12   through the Regional General Hospital, Williston material, as

13   well as what I would call Putnam or RightCHOICE material, as to

14   LifeBrite.

15        When it came to Waystar, if the submitter was

16   LifeBrite from Empower, when it got to Waystar, they now have

17   the submitter as Navicure, N-a-v-i-c-u-r-e.  Navicure didn't

18   even exist when some of this data was sent to Waystar.

19        So I asked Waystar and its counsel, "Can you explain

20   how it is that Navicure is on the documentation as the

21   submitter when there wasn't a Navicure when this occurred?"

22        And their response back was, "We've given you all

23   we're going to give you.  If you want to do another subpoena,

24   do another subpoena."

25        So we don't even know where Navicure came from.

1        Then I took a look -- that's -- in dealing with

2   Putnam.  Then I looked at Regional General Hospital Williston.

3   Empower turns it over with the submitter as LifeBrite.  Waystar

4   shows the submitter having been received from Empower as

5   Regional General Hospital.

6        So I said, "How can that be?  If we're submitting it

7   under one, how can you show it having been received under

8   another?"

9        Same problem.  No explanation.

10        "We're not willing to talk about it any further."

11        So what I'm asking the Court to do, I think on behalf

12   of all of the defendants, is to hold a pretrial Rule 104(a)

13   hearing, in which we are able, so the Court fully understands

14   the evidentiary issues here, to make a determination for

15   purposes of authenticity and admissibility about the evolution

16   of this claims information, the data.

17        At such a hearing Empower can testify under 104(d),

18   limited cross-examination.  Waystar can explain what they've

19   done with the data.  And then Availity can explain what they do

20   with the data.

21        And, most importantly, the insurance company can

22   explain how it is that data that was never sent by the

23   defendants now winds up on the claims information or claims

24   form that the insurance company has.

25        And it's incredibly complicated.  And I'm not sure

1    I'm the best person to be able to explain it.  But I know the

2    differences that have occurred.

3           And one of the major issues in this case is -- at

4    least from our perspective, is -- the government is going to

5    say the insurance companies provided false information.  It

6    makes sense to us, if we're going to be in that posture, for

7    the Court to understand what information we actually turned in

8    versus what information the insurance companies say it has.

9           And this gets to be incredibly complicated.  But to

10   give the Court an idea -- you may remember at the last hearing

11   we were talking about something called a type of bill 141,

12   which is how the billing was done by the defendants in this

13   case.  141 says nonpatient.

14          By the time it got to the insurance company, 141

15   became something called 22.  And 22 doesn't say nonpatient.  It

16   says outpatient, place of service, hospital.

17          We never submitted anything that said it was place of

18   service, hospital, or 22, but the insurance companies'

19   information says that.

20          So what we're asking for -- to move things along,

21   because I know what the Court wants to do, get beyond discovery

22   and let's get to the issues in the case, is to hold such a

23   hearing so that the Court can make determinations.  Otherwise,

24   with all due respect to -- and I don't know the Court's trial

25   posture.

1          Otherwise, these objections are going to be made

2    during trial.  And it's going to put us in a posture of getting

3    to a lot of minutia that I'm not sure the jury would

4    necessarily have to hear.

5          And hopefully, once we get to the bottom of the 104

6    hearing, we'd be in a position vis-à-vis the government to try

7    to work through the stipulations on some of this data.

8          If they want to show that false claims were made,

9    that's up to them.  But at least we'd be in a position to be

10   able to show what we sent and what the insurance company claims

11   we sent.

12          And with Waystar, the only way to get --

13          THE COURT:  I was just looking at your -- I was just

14   looking at your joint status report, which was filed pursuant

15   to my order to get ready for this hearing, and I'm not seeing

16   the request for the 104 hearing in this joint status report, or

17   any mention of -- of that.

18          All I -- and that's the reason, I think -- when I was

19   addressing one of your colleagues, I thought y'all were

20   complaining about what you were getting.  Now you're telling me

21   what you're complaining about is not what you're getting, it's

22   what you're -- it's what to make of what you're getting.

23          MR. SADOW:  I can't disagree with the Court.  And

24   it's not in the -- we understood -- at least -- I'm sorry.

25          I understood that the status report was to address

1  the discovery issues that were outstanding.  To that extent, if

2  I was incorrect, I apologize to the Court.  But it wasn't --

3          THE COURT:  Well, I guess I'm just -- I mean, I know

4  you've been doing this a long time, but, actually, I kind of

5  have now too.  It doesn't seem like it, but I've been doing it

6  a while.  And I have never had a 104 hearing.  Nobody's ever

7  asked me to have one.  I've never had one.

8          Have you done a lot of them?

9          MR. SADOW:  The answer to that is, I have done it on

10 occasion, but it's not something that happens in a whole lot of

11 cases.  But I've never had a case in which I was actually able

12 to go from -- in a false claim situation, in which the data

13 that was submitted by the defendants doesn't turn out to be the

14 same data that the -- the victims -- the alleged victims claim

15 to have received.

16         And I've done my best to try to understand how that

17 happens.  And I don't have an explanation, other than, "We're

18 going to be arguing we gave you this."

19         They're going to say that they received that.

20         We're not quite sure how they received that when some

21 of the electronic data that they are basing spreadsheets on

22 doesn't appear to exist anymore.

23         So all of those evidentiary issues that the Court

24 would address at a trial, you're going to have a jury sitting

25 in the box trying to understand why we're standing up

1    objecting, why we're asking to be heard.

2           And I just thought that in order to be more efficient

3    here, to hold that hearing for the Court to make certain

4    determinations in advance would take lawyer time, but not jury

5    time.

6           THE COURT:  Okay.  So is that the thing you were

7    going to say?  I mean, that's your -- that's your argument

8    today as to why the case can't be set for trial?

9           MR. SADOW:  Right.  And I'm not sure that that would

10   necessarily delay the trial much.  It's just a question of

11   whether the Court is willing to hold such a hearing.  I would

12   imagine we'd be able to hold a hearing like that in, what, a

13   day, if we have all the right people here, because it's just

14   for the Court to understand the evolution of the data.

15          THE COURT:  All right.  Hold that thought.  We'll get

16   back to that.  Let me -- let me go ahead and -- is there any

17   other defense lawyer that wants to talk about discovery?  Not

18   the 104 issue, but discovery.

19          MR. BELL:  Judge, on behalf of Jorge Perez, Tom Bell.

20          THE COURT:  Yeah.

21          MR. BELL:  If I could summarize briefly -- and, Your

22   Honor, I would think that we all share the Court's frustration.

23   I don't think any of us really want to get a couple hundred

24   more -- a hundred thousand documents to review in the course of

25   this.

1          But I would respectfully suggest to the Court that
2    we're not completely done with the discovery process.  I was
3    the primary author, not the exclusive author, of the status
4    report.
5          I certainly didn't anticipate the Court wanting kind
6    of a preview of motions or hearings that might be necessary
7    before the trial.  And I would -- certainly appreciate a 104(a)
8    hearing would be very unusual, but this is a very unusual case.
9          Usually when we get to a trial on a wire fraud case,
10   there's some summary of the vast amounts of data, but usually
11   no significant question of whether it's reliable.  And there is
12   in this case.  But I didn't anticipate that the Court was
13   interested in hearing about that yet.
14         So to some extent I'll share the responsibility for
15   that with Mr. Sadow and the others.
16         And I think it's also important for the Court to
17   remember why we're here still, is despite the -- contrary to
18   the insurance companies' representations today, much of what we
19   will -- have been looking for for the last six to eight months
20   was probably contained in the initial grand jury subpoenas
21   issued by the government that they never got.  They just didn't
22   respond.
23         And it may have been just that institutional kind of
24   habit, that they send them the summaries and charts that they
25   usually do and they didn't anticipate the raw data.

1           Maybe they did or didn't know that the summaries that

2    they were providing really weren't accurate representations of

3    all -- of all the codes and the representations that were

4    contained in the UB-04.

5           But, nevertheless, particularly in April, as a result

6    of the due process motions, and a result of somebody from the

7    civil case in Missouri stepping forward and providing the Court

8    what was clearly exculpatory evidence, in our view, in terms of

9    the e-mail chain -- and I would suggest to the Court, we still

10   haven't gotten the e-mails from RightCHOICE in any form or

11   variety.  So, essentially, we're still six months from -- from

12   that disclosure.

13          So contrary to the counsel for United's

14   representation that, you know, we're fishing around for

15   potential exculpatory evidence, well, to some extent that's

16   true, because we know it's there.  We know -- we're very

17   confident that some of that's there.  And so the frustration

18   we're sharing is, there do seem to be some gaps left in the

19   insurance company production.

20          And Empower has provided the raw data that was

21   submitted to the initial clearinghouse.  But we -- what we

22   haven't seen is what the insurance -- what was kind of

23   processed downstream.

24          And that, I would respectfully suggest to the Court,

25   is absolutely critical to not only the admissibility, but

1  potential exculpatory evidence if there were no false
2  representations.
3          And I don't dispute -- this is a big case for -- you
4  know, with a massive amount of discovery for everybody.  But --
5  and the government has largely kind of complied with discovery.
6          But from the defendants' point of view -- and I cite
7  just one example.  One of the evolving theories of the
8  government, as expressed in the indictment, was few, if any, of
9  these actual lab tests were performed at the hospital.
10          The evidence seems to suggest that's not true.  There
11  were significant amounts of testing done at all of these
12  hospitals.  And there were lab operations that were financed
13  and operated.
14          And, for example, one -- you know, one gap in the
15  discovery is this, is -- they were interviewed by government
16  agents; came out to the Williston facility and conducted an
17  interview and a walk-through with my client and lawyers.  And
18  they examined the lab.  They took photographs of the lab at
19  Williston, and operating -- they interviewed lab personnel
20  about the number of tests being done.
21          Well, having photographs of -- and they took
22  photographs.  Having photographs might be relevant evidence, in
23  that there were operating labs at these hospitals.
24          I asked the government a number of times over the
25  course of the months -- Mr. Duva and the others have -- have

1    conscientiously, kind of, investigated that.  And it appears

2    that those photographs have been lost.

3            It's not that they weren't taken.  It took some time

4    to produce the reports.  The 302 summaries or their equivalent

5    have been provided.  But what's conspicuously missing and

6    what's frustrating for the defense, and what is a gap -- is a

7    gap in the evidence is the photographs that depict the event

8    that occurred, a working lab.

9            And so it's examples like this -- and, essentially,

10   in April the Court discovered, essentially, the -- the

11   significance of the 837s, more so in why the data that we

12   received initially wasn't consistent with the 837 data.  And

13   we've been fighting about it ever since.  We're not quite

14   there.

15           I would suggest that the e-mail presentations are

16   significant.  I would respectfully suggest either a 104(a)

17   hearing or a final status hearing before you set the case for

18   trial sometime, you know, early to spring to summer of next

19   year, so that any remaining issues can be resolved, and we can

20   maybe potentially start litigating the admissibility of -- of

21   this evidence and coordinate.

22           Judge, I don't think -- I can tell you from my --

23   only my individual perspective, the prospect of reading a

24   couple more thousand e-mails is not something that I'm looking

25   forward to, but it needs to be done.

1    Arguing with the insurance companies about whether

2    it's designated confidential, sensitive, or -- or -- or subject

3    to redaction, which would strike me in the ordinary course of

4    events as routine investigation material, also doesn't strike

5    me as something I'm looking forward to, but it needs to be

6    done.

7        Because we know there have been shifting theories

8    about what the fraud was.  And what we still don't have is

9    really concrete evidence, in our view, that there was any

10   fraud.

11       And so the opportunity to continue to investigate

12   that -- and we have learned that the insurance companies

13   have -- have not always been completely, kind of, honest -- or

14   100 percent compliant with the government's, kind of, request

15   through the -- for full disclosure, in terms of how this coding

16   occurred.

17       And until we have the opportunity to do so -- I would

18   say we're a lot closer than we were in July, but we're not

19   quite there yet, Your Honor.

20       THE COURT:  Thank you.

21       Any other defense counsel want to address the issue

22   of discovery?

23     (No response.)

24       THE COURT:  All right.  I've already heard from

25   United.

1      And, Mr. Medina, do you want to be heard on behalf of
2   Aetna?
3      MR. MEDINA:  Thank you, Your Honor.  Yes, very
4   briefly.
5      I'll just note that Aetna received three subpoenas.
6   We've complied with all three.  We've completed production on
7   September 30th.  That was a rolling production from July 8th,
8   working with the government and the defendants' counsel.
9      Aetna has no further responsive documents.  And we
10  have not heard anything from defendants or government since
11  making those productions suggesting in any way that we are
12  deficient.
13      And, indeed, in the joint defense status report,
14  you'll see excepting Aetna in their defendants' complaints
15  about some of the 837I data.  And I'm glad to hear that the
16  privilege log is at least up to snuff for some of the defense
17  counsel.
18      So for Aetna I believe that we have complied.  We
19  have done everything asked of us.  We met and conferred, as the
20  one defense counsel said, in good faith, and have not heard
21  anything about any deficient production.
22      Thank you.
23      THE COURT:  Mr. Wedekind, I have to confess, the Blue
24  Cross designations confuse me sometimes.  You -- you represent
25  Blue Cross and RightCHOICE, I'm told, at least that's what's

1  written here.  And Mr. Steif and Mr. Burns represent Florida

2  Blue.

3          Are those different entities?  Or are y'all on the

4  same team?  Or what?

5          MR. WEDEKIND:  Yes, Your Honor, they're different

6  entities.

7          THE COURT:  Okay.  So tell me what -- tell me where

8  things stand.  Were you the subject of Rule 17s?

9          MR. WEDEKIND:  Yes, Your Honor.  And so where we

10  are -- as you heard this morning from my new best friend, Don

11  Samuel, my clients -- and I think this is also true of the

12  other insurers -- have been working cooperatively to try to

13  comply with the Rule 17 subpoenas, as it relates specifically

14  to the Anthem entities, which is Blue Cross Blue Shield of

15  Georgia and RightCHOICE, my clients.

16          Our only concern is our deference to this Court's

17  authority to review Judge Toomey's order on the amended

18  protective order.

19          We went to great efforts, as I'm sure the other

20  insurers did, to review documents.  They're ready to go.  We

21  have privilege logs.

22          THE COURT:  How quickly can they be produced once I

23  rule on the appeal?

24          MR. WEDEKIND:  Within hours, Your Honor.  All that

25  needs to be done is the transmittal letters need to be dated

1    and signed.

2              THE COURT:  Okay.

3              MR. WEDEKIND:  So we're ready to go.  We are just

4    waiting on this Court's order resolving the amended protective

5    order.  And then we're ready to roll.

6              THE COURT:  Thank you.

7              I don't know, Mr. Steif, Mr. Burns -- I'm not sure

8    who's going to speak.

9              Mr. Burns?

10             MR. BURNS:  Good morning, Your Honor.  Jared Burns on

11   behalf of Florida Blue.

12             THE COURT:  Good morning.

13             MR. BURNS:  Florida Blue timely produced everything

14   that was requested from it.  So the government's status report

15   accurately describes the 837I data.  We produced provider

16   manuals, claims info, e-mails, and provided a privilege log.

17             Shortly after providing that information, Mr. Sadow

18   sent an e-mail with a question about the privilege log.  And

19   that was withdrawn hours later.

20             Since that time, no one from the defense has reached

21   out to us with any issues regarding our production or the

22   privilege log, until several minutes ago.

23             We did produce hundreds of e-mails without any kind

24   of redaction or restriction.  Everything that has a redaction

25   is included on the privilege log, which I believe is quite

1   detailed and contains all the information necessary to

2   determine why it is those documents are either privileged or

3   redacted.

4          And so pending any other questions from the Court --

5          THE COURT:  So is it fair to say that you feel like

6   Florida Blue has made full compliance with the Rule 17s?

7          MR. BURNS:  Yes, Your Honor.

8          THE COURT:  Okay.  Thank you, Mr. Burns.  Appreciate

9   it.

10         MR. BURNS:  Thank you, Your Honor.

11         THE COURT:  Mr. Winters, I'm sensing now we're on two

12  different issues here, now that Mr. Sadow has spoken.  We're

13  talking about the issue of what needs to be produced.

14         And the government has essentially represented to me

15  that you've produced everything that you feel like you had to

16  produce.

17         And I frankly haven't heard much different from the

18  defense counsel on that point, so -- but then we also have the

19  productions that were made through the Rule 17s, which are

20  ongoing.  And there may be some issues there.

21         But it seems to me those are likely issues that would

22  have to be resolved between the defendants and the insurance

23  companies and, if not able to be resolved, then to the Court.

24         But -- so there's that issue.  And I think I can

25  manage that issue.  And I think we can -- I'll give us a way

1    forward in a moment.

2          But now we also have this ore tenus request -- or

3    discussion with -- from Mr. Sadow about a Rule 104 hearing.  I

4    don't know if the government -- was the government aware of

5    that -- of that issue until this morning?  Have you-all

6    discussed that?  Or where -- give me any reaction to that.

7          MR. WINTERS:  This was the first I've heard of it.

8    We're aware that there are going to be questions, I would

9    assume -- in a case like this, the defense will question

10   authenticity and admissibility of documents, including claims

11   data.  But this is the first I've heard of a 104 request.

12         THE COURT:  All right.  Do you have a position on it?

13   Or do you want to consider your position?  Or what?

14         MR. WINTERS:  I'd like to be able to confer with

15   Mr. Duva about -- about that.  Look, I -- I think there's just

16   some fundamental misunderstanding about what these EDI 837I

17   submissions are.

18         I would just -- there was reference to the Missouri

19   case, the Missouri civil litigation that Mr. Schwartz

20   referenced.  And I would just note that in that -- that was a

21   civil case brought by Anthem against a number of defendants,

22   including some of the people here.

23         That -- the case went to trial.  It was tried about a

24   month ago in Missouri.  It was a full victory for the insurance

25   company on their fraud claim.  And they had a number of other

1   claims, civil claims, contract claims.  But it was a full

2   victory for the insurance company.  In fact, I think they even

3   got punitive damages.

4           My understanding is -- and I haven't been able to

5   read all the transcripts.  And I think some of this was done

6   orally in court.

7           But I think some of the 837I data, maybe all of the

8   837I data, was not even admitted at trial.  Essentially,

9   here -- let me -- let me see if I can break this down a little

10  bit so the Court understands the 837I data, because it is

11  important.

12          As Mr. Sadow said, when a claim is submitted from a

13  hospital or from the billing company on behalf of a hospital --

14  and this is sort of universal in healthcare, that, you know,

15  providers often use billing companies to submit.  So in this

16  case it's Empower, or Empower's agent JVS.

17          A claim is submitted -- a lot of information is

18  provided.  So there's the -- there's the name of the patient.

19  There's the service that was provided.  There was the referring

20  provider.  There's a whole bunch of information that's

21  provided.

22          Two key pieces of information that go in that claim

23  that are really at issue here is:  Who submitted the claim and

24  who was the -- who was the rendering provider and who's the

25  billing provider of the claim?

1              Those are two different things.  Okay?

2              The submitter -- the submitter of the claim is the

3    entity that -- that is literally pressing the button on the

4    computer to transmit the claim.  That's the submitter field.

5              And that's what we heard about in the argument in

6    April about these 837Is that had been obtained in the Missouri

7    civil litigation, that showed that in the submitter field there

8    was the identity of a -- of one of these independent

9    laboratories, LifeBrite or Pinnacle or Caldera.

10             SeroDynamics, which was another lab that was used for

11   Putnam -- that's who the trial was against in Missouri.  Okay.

12             So that was in the submitter field.  The rendering

13   provider and the billing provider is entirely different.  That

14   is the information that passes through the clearinghouse and

15   passes through to the insurer.  And that's what's shown on the

16   claims spreadsheets that the insurers have provided to us many

17   years ago, and that we've turned over to the defendants.

18             In other words, when these -- the submitter is

19   identified as coming from -- when the submitter is identified

20   as coming from the billing company to the clearinghouse -- when

21   the clearinghouse turns around and sends that claim to the

22   insurance company, the submitter becomes the clearinghouse.

23             That's what I think the defendants are not

24   understanding with respect -- about this data.  The submitter

25   and provider are two different things.

1          Again, the submitter is simply saying, "I am the
2     entity that is submitting this claim to you, the next party in
3     the chain."
4          So if Empower -- in a typical situation, if Empower
5     submits the claim to Waystar, or to ZirMed, in that submitter
6     field could be Empower, it could be the hospital, Putnam, that
7     Empower is acting on behalf of.
8          And we've seen some of these 837 -- these PDF
9     printouts that were brought into court in the April hearing
10    that showed, for reasons that are hard to understand, that the
11    independent lab was identified as the submitter.
12         But when Waystar/ZirMed turns around and submits a
13    claim to the next party in line, either another clearinghouse
14    like Availity or directly to the insurance company, the
15    submitter becomes that clearinghouse.
16         And so what -- when we first started exploring this
17    issue with Florida Blue, in order to get the 837I data and turn
18    it over to the defendants, what Florida Blue told us is that
19    when we get the claim -- when we, Florida Blue, get the claim,
20    the submitter is identified as the party that submitted it to
21    us, literally the party that transmitted that claim to us,
22    which in Florida Blue's case is Availity.  So then if you look
23    in the Availity data, if Availity gets the claim from ZirMed,
24    the submitter is shown as ZirMed.
25         So when Mr. Sadow talks about information changing as

1    it goes down the line, the submitter field does change when it

2    goes down the line.  And this is very standard.

3            This is -- there's a whole protocol for the 837I

4    submission process.  And this is exactly what it says.  This is

5    exactly how it works.

6            What does not change -- and the defendants cannot

7    dispute that this does not change -- is that the provider --

8    the identity of the provider as being Putnam Hospital, or CGH

9    hospital, or Regional General Hospital Williston, or Chestatee,

10   that does not change when it passes through the clearinghouse

11   to the insured.

12           Of course it doesn't change, because the insurer gets

13   the claim -- they have to know what triggers their payment

14   obligation.  And the defendants cannot dispute that the

15   insurers paid them for these claims.

16           So when Putnam submitted a claim to ZirMed and the

17   claim went over to Anthem, what came through all the way -- and

18   there cannot be any dispute about this -- is that the identity

19   of the provider, the NPI number -- the National Provider

20   Identification number -- it's the unique identification number

21   for every healthcare provider in this country, doctors, nurses,

22   nurse practitioners, hospitals, et cetera -- the NPI number and

23   the tax identification number, which there will be testimony

24   from insurance companies that that's what triggers their

25   payment obligation -- that came through all the way to the

1   insurance company.  There cannot be any dispute about that.

2          The claim spreadsheets that were produced to us by

3   the insurance companies at the beginning, that we turned over,

4   contain the -- the -- identify the provider of the service as

5   the hospital in all instances.  They do not identify the

6   independent lab as ever having provided these services.

7          The reason that the submitter field changes along the

8   line is --

9          THE COURT:  I think -- I think I get the gist.

10          MR. WINTERS:  Okay.  That's what the evidence is

11   going to show.

12          THE COURT:  I don't -- okay.  I appreciate that.  All

13   right.

14          MR. WINTERS:  All right.

15          THE COURT:  Thank you.

16          I'm going to, in a moment, just take a brief recess

17   to assess where we are and then to come forward with a

18   schedule.

19          But before I do, is there -- can I ask United -- have

20   you-all withheld your production until I rule on the appeal as

21   well?  Or have you made your production?

22          MS. AL-TAIE:  Your Honor, this is Ferdose al-Taie for

23   United.  We have produced in full.

24          THE COURT:  Okay.  So which insurer -- which insurer

25   is -- it was you, Mr. Wedekind?  You're the only one that's

1    not?

2              MR. WEDEKIND:  Your Honor, that's my understanding.

3              THE COURT:  Okay.  Thank you.

4              MR. WINTERS:  And, Your Honor, may I just -- I just

5    want to correct the record on one thing.  And it may have just

6    been an error.

7              I think Mr. Rafferty indicated that Anthem had not

8    turned over 837I data.  And if he did say that, I think it was

9    just a mistake.  They have turned it over.  We've turned it

10   over.  I believe that all that's remaining from Anthem is the

11   e-mail production, if I'm not mistaken.

12             THE COURT:  Okay.  All right.

13             Yes, Mr. Sadow?

14             MR. SADOW:  Just a brief response.  And I know the

15   Court is considering this, having been given it to -- very

16   little notice.  But I have a report -- a memorandum that was

17   done with regard to UnitedHealthcare, dated September the 13th,

18   2018, talking about an interview of a representative of

19   UnitedHealthcare.  And to the extent that I can give the

20   government its DOJ number, I'll be glad to.

21             But if the Court were to look at this report, I think

22   you would understand exactly what it is that we are trying to

23   suggest is necessary in the 104 hearing.

24             THE COURT:  Well, I'll tell you what I'm going to do,

25   Mr. Sadow.  As part of my consideration, I'm certainly going to

```
 1    give you and -- if it's everybody -- I'm going to give you
 2    leave to file a motion to conduct such a hearing.
 3              As I said, I've never conducted one before, but
 4    I'm -- it's in the rules, so I -- I mean, I'm -- I'm certainly
 5    willing to look at it.
 6              And I think the right way to do it, though, will be
 7    for you to file a motion with authorities and tell me kind of
 8    what you're getting ready to tell me here.  And if you want to
 9    attach that piece of paper to it, that will be fine.  And then
10    the government will respond.  And then I'll decide, you know --
11    we'll do it that way, I think.
12              I don't think I'm going to be able to rule on an
13    ore tenus motion based on something that has some level of
14    complexity to it that you-all certainly understand way better
15    than I do at the moment.
16              So I think that's the way we're going to proceed.
17              MR. SADOW:  Fine, Your Honor.  Be glad to do so.
18              THE COURT:  Okay.  Anybody else want to say anything
19    before I take a brief break?  And when I come out, I'm going
20    to -- I think I'm going to -- I tell you what -- Mr. Bell, I
21    think you were the -- the one that initiated this the last
22    time.
23              I'm hearing you-all say that we can't go to trial in
24    January.  That's probably right.  I don't even know if the
25    government thinks otherwise.
```

1          But given that the Court is likely to come up with a

2    schedule that finalizes the discovery and any -- any issues

3    that arise out of it can be dealt with, and then provides for

4    Mr. Sadow's motion, and then we -- we'd get the matter to

5    trial, what -- is there a --

6          MR. BELL:  There is, Judge, an ore tenus motion to

7    continue the trial until the Court feels is appropriate.  We

8    suggest probably later than sooner.

9          But I think we all generally agree kind of the target

10   area mid next year would be appropriate, from the defendants'

11   view.

12         However, you did give me a chance to get up here

13   again, so I can't resist the opportunity to at least rebut

14   shortly Mr. Winters, and say, as far as he goes -- what the

15   representations are so, as to the 837s, but there's more to it

16   than that.  And I would be remiss with my client listening if I

17   didn't take that opportunity.

18         That's all I've got to say, an ore tenus motion to

19   continue the trial, Your Honor.

20         THE COURT:  All right.

21         All right.  Anybody else?

22         I take it --

23         MR. DUVA:  Your Honor, Tysen Duva from the

24   government.  The government does not object to a limited

25   continuance.  And, of course, the Court is correct, we're not

1    pushing for a January trial.  But -- but given the status, we

2    believe that a limited continuance is in order.

3            And we're asking the Court to set the case for trial

4    in the spring, March or April, sometime in that range.  That's

5    six, seven months away from now.

6            We don't believe that a continuance to the summer or

7    later, as Mr. Bell said, potentially into the fall of next --

8    of next year, is appropriate.

9            THE COURT:  Thank you, sir.

10           All right.  I'm going to take a brief recess and

11   confer briefly.  And then I'll come out and we'll call the

12   play.  And then we'll -- and I understand you've got a plane,

13   so we'll try to -- we'll try to get this moving.  I think we're

14   almost done.

15           All right.  We're in recess.

16           COURT SECURITY OFFICER:  All rise.

17      (Recess from 10:57 a.m. to 11:09 a.m.; all parties

18   present.)

19           COURT SECURITY OFFICER:  All rise.

20           LAW CLERK:  All rise.

21           COURT SECURITY OFFICER:  This Honorable Court is back

22   in session.  Please be seated.

23           THE COURT:  Susanne.

24      (Judge confers with law clerk.)

25           THE COURT:  All right.  Well, after the hearing today

1    I'll be entering an order that rules on the appeal of Judge --

2    of the -- of Judge Toomey's amended protective order.  And I'll

3    be finding that Judge Toomey's order was neither contrary to

4    law nor clearly erroneous, and it's due to be affirmed, and,

5    therefore, the amended protective order will govern.

6           I did not view the issue of burden of -- on the

7    production to be -- I read the amended protective order.  And

8    it looked fine to me.  And so I -- I don't have any basis to --

9    to overrule Judge Toomey's considered judgment there.

10          And, as I said, the standard is contrary to law or

11   clearly erroneous.  And I don't -- I'm not able to make that

12   finding.

13          And, as I said, I -- I'm not -- I'm -- from what I've

14   heard here today and my own sense of things, I think the

15   amended protective order is fine.  And if it -- if it causes a

16   problem, then I'm sure somebody will let me know, but...

17          So with that, then Mr. Wedekind's folks will be

18   producing the documents that they're ready to produce

19   forthwith.  And I'll grant the extension and -- but require the

20   documents to be produced as soon as possible.  And Mr. Wedekind

21   said they're ready to roll.  So that will happen.  So that's

22   that.

23          And then with respect to any outstanding

24   discovery-related issues, the Rule 17s, if somebody hasn't --

25   if -- if Availity hasn't complied and you can't get them to,

1    then -- what I'm going to suggest, always, is that

2    conversations and efforts be made, short of motion practice, to

3    clear up any issues with the discovery, and that -- but that

4    if -- if that doesn't bear fruit, that you go ahead and file a

5    motion with the Court and -- and, of course, we'll get a

6    response.

7           And you -- it will likely be Judge Toomey that would

8    rule on those motions, but -- but I -- I'm not hearing -- I did

9    come in with a little different understanding than I've been

10   given here this morning, that -- while I do understand there

11   are issues and concerns, it sounds to me like everybody's

12   operating in good faith.  It sounds like -- that discussions

13   have been had that have resulted in understandings and

14   agreements.

15          I would -- I would encourage everybody to continue to

16   do that.  I would encourage the defendants to be reasonable in

17   what they're asking of the insurance companies.  And I would

18   encourage the insurance companies to be forthright in what

19   they're producing, and not be overly technical in -- in the way

20   they're approaching it.  And to the extent that we can build on

21   the -- what's happened so far, I think that -- that will all be

22   to the good.

23          I'm assuming that any further Rule 17 subpoenas are

24   going to be few and far between, if any.  I think I was told

25   maybe another one will be filed.  I can't quite remember by

1    whom.

2           But, you know, I -- I'm -- I'm not saying no, but I

3    just think that -- as Mr. Sadow has framed it to me more now,

4    it's not necessarily all about what you don't have.  It's what

5    you do have and what you make of it, and whether the

6    government's proposal as to the way they're intending to

7    proceed is appropriate or not.  And that's a separate issue.

8           And so -- so bottom line is, I think discovery ought

9    to be collaborative whenever it possibly can be, and that

10   motions relating to discovery ought to be filed as soon as

11   possible, but no later than December the 1st.

12          That will also be the date by which Mr. Sadow's

13   motion for Rule 104 will be due.  It can be filed sooner.  And

14   I encourage anybody who really feels like they've got a

15   discovery issue and it's teed up -- you don't have to wait

16   until December 1st.  I would encourage you to file it now.

17          I don't -- what I'm trying to do is balance between

18   good-faith conversation and trying to work it out.  And if you

19   really can't, then, okay, let's get it in front of the Court.

20          Make sure you've done all your good-faith conferring

21   before you file anything.  But if you really feel like you've

22   got to file something and get it in front of us, go ahead and

23   do it sooner, rather than later.  But, in any event, no later

24   than December 1st.

25          Obviously, response to motions, including the 104

1  motion, would be due from the government -- and I'll make it --

2  I know there's -- we're in a holiday period there, but -- let

3  me make sure I've -- I've looked at days of the week here to

4  make sure I haven't asked you to do something -- yeah,

5  December 1st.  And then I'll give the government until December

6  17th to respond -- a little over two weeks to respond.

7       Obviously, the insurance companies -- actually, I'll

8  make it the two weeks.  And if the government needs a couple of

9  extra days, they can ask me for it.  I'd like to kind of get

10  the show on the road, get it in -- get the motion practice in

11  before the holidays, so we'll have a chance to start looking at

12  it.

13       The insurance companies -- if there is discovery

14  practice, the insurance companies would also have until

15  December 15th to respond to any motion practice.

16       And then -- as I said, sooner rather than later, but

17  that would be -- those would be the deadlines for doing that.

18  And it's also the deadline for Mr. Sadow to file his 104(a)

19  motion.

20       And I'm going to establish a date for hearing on any

21  motions.  I'm not -- I want to make clear I'm not granting the

22  motion for 104, but I want to go ahead and have a date on the

23  calendar to hear that motion, if I decide to, or to hear any

24  other motions that are filed by the motions deadline, which is

25  December the 1st.

1          Again, we've already had some motion practice, so

2    I -- I'm not inviting it.  And, you know, be -- be well

3    advised.

4          But I'm going to go ahead and set a date for a

5    hearing on motions, whether that be a hearing on the 104 -- I

6    may enter a ruling before the date.  So I'll -- in other words,

7    if I grant the 104 hearing, we may have it on the date of the

8    hearing I'm going to set, or it may be a hearing to determine

9    whether we're going to have it or not.  I have to -- I have to

10   see what gets filed, see what the government says, before I can

11   figure that out.

12         But I am going to go ahead and set another motions

13   hearing date to -- to just have that on the calendar so we can

14   use it as we need it and it's on the calendar.

15         Of course, Judge Toomey, you know, may well, if there

16   are other -- other motions that get filed earlier on on

17   discovery, Judge Toomey may well have ruled on some of that.

18   So I'm not necessarily saying we would wait to rule on these

19   motions as -- but this would be a date to do so.  Let me...

20         I'm looking at early February.  I was thinking about

21   Groundhog Day just for -- but I -- I think I'm going to go out

22   another -- let's do Tuesday, February 8th.  And we'll do it at

23   10 o'clock.  Tuesday, February 8th.

24         And that's motion hearings on the 104, if we need to

25   have it, or any other motions that get filed by the deadline of

1    December the 1st.

2          And then I'm going to -- Mr. Bell, were you making

3    that ore tenus motion on behalf of all the defendants?

4          MR. BELL:  That was my understanding, Your Honor.

5          THE COURT:  Okay.  All right.  I just wanted to make

6    sure.

7          Anybody in dissent?

8          MR. BELL:  I don't see anybody shaking their head or

9    objecting.

10          THE COURT:  All right.  I'm going to assume that's an

11   ore tenus motion on behalf of all the defendants.

12          The Court is going to grant the ore tenus motion for

13   continuance.  The Court finds that for the reasons that are

14   obvious on this record, and the entire record -- could be used

15   to justify it.

16          But for the reasons that are obvious from this

17   record, the ends of justice served by that continuance outweigh

18   the interests of the defendant and the public in a speedy

19   trial.

20          And it's the Court's intention to set this case

21   for -- for trial -- I know you-all said it was a multi-week

22   trial.  I know -- I think some of you may -- were you -- were

23   some of you in with Judge Howard just recently?

24          MR. CITRO:  Yes, Your Honor.  I was.

25          THE COURT:  Yeah.  So that was -- said it was going

1    to take five or six weeks and it ended up taking more like

2    three.  And that's usually our experience, is it doesn't take

3    as long as people think it's going to.  But I guess you never

4    know.  And I know there's a lot of defendants in this case.

5           There's -- I think there were four in the one in

6    front of Judge Howard.  But -- and there's more in this case.

7    But I'm going to go ahead and set it on the -- set it to begin

8    on May the 9th, and running until completion.

9           There's a three-week block there that is unabated.

10   And then we do have Memorial Day on the 30th.  And if we're not

11   done, we'd have to continue.  But I'm -- if I'm a betting man,

12   I'd say we're going to be done within that window of

13   opportunity.

14          And so the -- the trial is scheduled for May the --

15   May 9th -- to begin on May 9th, 2022.  There is a possibility

16   we'll pick the jury on Friday, May the 6th, although I doubt

17   that.  Probably we'll do jury selection on the 9th.

18          And -- and then I'm going to go ahead and set a -- a

19   status conference -- we've got a motion hearing in February,

20   but we'll also need a status, just to get us -- you know, make

21   sure we're -- we've got all our ducks in a row.

22          And I'm going to try to set that in April so that,

23   you know, if we do have any issues or things we need to get

24   smoothed out before we go to trial, we'll have an opportunity

25   to do that.  And I'm looking at Tuesday, April 19th.  Tuesday,

1    April 19th, again, at 10 o'clock.

2            So the schedule is:  Deadline to file motions,

3    including the 104 motion, including any discovery motions, is

4    December 1st.  Deadline for responses to motions are December

5    15th.

6            The Court will hold a hearing on February the -- what

7    did I say?

8            MR. SADOW:  8th.

9            THE COURT:  -- 8th, at 10 o'clock, for -- on any

10   motions, including 104.  And the Court will endeavor to make a

11   ruling on the papers as to whether to even hold that hearing or

12   not, so that we could actually have the hearing on that date,

13   if that's what we needed.  And -- and then the -- the status,

14   as indicated, on the 19th of April.  And the trial will begin

15   on May the 9th.

16           Recognizing that we've got a lot of people in this

17   room that have lots of schedules and lots of things going on,

18   and recognizing we're never going to be able to probably make

19   everybody completely happy, I will, nevertheless, entertain any

20   discussion of that schedule.

21           Starting with the government.

22           MR. WINTERS:  We have no objection to that schedule.

23           MR. DUVA:  Agree, Your Honor.

24           THE COURT:  Anybody want to be heard?

25       (No response.)

1    THE COURT:  Okay.  All right.  So here's the deal --
2  you know, as I told Mr. Sadow, I've now been doing this a
3  while, just like many of you.  And I've learned never to say
4  never.
5    But this is -- this is what -- this is the plan.  And
6  I think people ought to -- people ought to plan on this,
7  because we cannot just let this case continue to drift.  I'm
8  doing everything I can to be fair to the defendants.
9    I understand they've got things they want to do
10  and -- and theories they want to explore.  And I'm trying to be
11  generous with -- as I can, with allowing that, and also to give
12  every due to any legitimate issue that they want to raise and
13  consider.  And that's what I've tried to do with this schedule.
14    But it is not my intention to -- to continue this
15  trial beyond the date that I've given.  I think it's a fair
16  date.  And I think we can work toward that.  And so I think
17  that ought to be the expectation.  And it's going to take some
18  really, really persuasive reason that we cannot go at that
19  time.
20    And so I really hope that everybody will know that
21  I'm serious about that, and that the clients will also be aware
22  of that, which reminds me, I do -- I do want to put a plea
23  deadline into the mix as well, because I think that would be --
24  I think that is helpful.  And I have no idea what people are
25  thinking or what the possibilities are, but I think we ought

1    to -- we ought to do that.  And let me look at the -- let me

2    look at the schedule here.

3            I tell you what -- I'm not necessarily going to agree

4    with you, but let me just ask the government if -- given -- now

5    that you know what the schedule is, does the government have a

6    suggestion where in that -- where in that matrix a plea

7    deadline should occur?

8            And then, Mr. Sadow, I'll just ask -- I'll ask you to

9    give me any thoughts you have, and anybody else who's able to

10   do it as well.

11           But, Mr. Winters, what's your -- I want -- you know,

12   y'all probably have a better feel for this than I do.  What

13   would be your thinking, in terms of a -- of where to plug in a

14   plea deadline?

15           MR. WINTERS:  I think between two and three months.

16           MR. DUVA:  Your Honor, this is Tysen Duva.  I'll take

17   this one, if it's okay.

18           THE COURT:  Okay.

19           MR. DUVA:  We think after the February 8th hearing,

20   but at least a couple of months before the trial is set to

21   start.  I think that's the right window.

22           THE COURT:  All right.  Mr. Sadow, do you want to be

23   heard on this?  And I won't -- I won't exclude anybody, but I

24   just want to get some thinking on it.

25           MR. LANDES:  I'm going to trial.  I don't need to

1    even write this down.

2            THE COURT:  All right.

3            MR. SADOW:  I believe that whatever the government

4    just said, we're not in disagreement with.

5            THE COURT:  All right.

6            MR. SAMUEL:  Whatever they said?

7            THE COURT:  What -- all right.  Let me -- let me look

8    at the calendar here.

9            MR. SADOW:  And maybe we could ask the Court to set a

10   date for the government to determine whether it's going to move

11   to dismiss as to all defendants.

12           THE COURT:  How about -- it will be the same -- it

13   will be the same date.  How about that?

14           MR. DUVA:  We can set that one today, Your Honor.

15           THE COURT:  Well, being serious -- it's a serious

16   matter.  And I know it's serious to the people involved.  And I

17   want to give everybody sufficient time to consider their

18   options, but we -- it is important that we know who's going to

19   trial and who's not.

20           And -- and so -- and if everybody is, then everybody

21   is.  But I'm thinking that -- would March 18th be a reasonable

22   time?  Does anybody want to object to that date?

23           MR. DUVA:  No, Your Honor.  That's reasonable.

24           THE COURT:  Plea deadline is March 18th.  And that

25   will be included in the schedule that we -- that we will issue

1    after the order of the Court today.

2            Anything else?

3            LAW CLERK:  No.

4            THE COURT:  Okay.  All right.  That's where we are.

5    Is there any -- while we've got everybody in the room here --

6    I'm not asking for more discussion.  But is there anything else

7    that we can accomplish reasonably at the moment, or -- or have

8    we done everything we can do?

9            Anything else from the government?

10           MR. WINTERS:  Nothing further from the government.

11           MR. DUVA:  Nothing from the government, Your Honor.

12           THE COURT:  Anything else from the defense?

13           MR. SADOW:  No, Your Honor.

14           MR. BELL:  No, Your Honor.

15           MR. RAFFERTY:  No, Your Honor.

16           THE COURT:  Anything else from the insurance

17   companies you wish to be heard on?

18           MR. BURNS:  Nothing further, Your Honor.

19           THE COURT:  Okay.  All right.  Well, thank you all

20   for your attendance this morning.  And we are in recess.

21           COURT SECURITY OFFICER:  All rise.

22       (The proceedings concluded at 11:28 a.m.)

23                              - - -

24

25

**CERTIFICATE**

UNITED STATES DISTRICT COURT     )
                                 )
MIDDLE DISTRICT OF FLORIDA       )


        I hereby certify that the foregoing transcript is a true

and correct computer-aided transcription of my stenotype notes

taken at the time and place indicated herein.


        DATED this 26th day of October, 2021.




                    s/Shannon M. Bishop
                    Shannon M. Bishop, RDR, CRR, CRC